## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

JYOTHISWAROOP JAYAPRAKASH,
derivatively on behalf of
BATH & BODY WORKS, INC.,

    Plaintiff,

    v.

DANIEL HEAF, ALESSANDRO BOGLIOLO,
LUCY BRADY, FRANCIS HONDAL,
DANIELLE LEE, SARAH NASH, JUAN
RAJLIN, STEPHEN STEINOUR, J.K.
SYMANCYK, STEVEN VOSKUIL, EVA
BORATTO, and GINA BOSWELL,

    Defendants,

    and

BATH & BODY WORKS, INC.,

    Nominal Defendant.

Case No.: 2:26-cv-00245

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Jyothiswaroop Jayaprakash ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Bath & Body Works, Inc. ("Bath & Body Works" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Daniel Heaf ("Heaf"), Alessandro Bogliolo ("Bogliolo"), Lucy Brady ("Brady"), Francis Hondal ("Hondal"), Danielle Lee ("Lee"), Sarah Nash ("Nash"), Juan Rajlin ("Rajlin"), Stephen Steinour ("Steinour"), J.K. Symancyk ("Symancyk"), Steven Voskuil ("Voskuil"), Eva Boratto ("Boratto"),

and Gina Boswell ("Boswell") (collectively, the "Individual Defendants," and together with Bath & Body Works, the "Defendants") for breaches of their fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Boswell, Heaf, and Boratto. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bath & Body Works, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Bath & Body Works' current and/or former directors and officers from June 4, 2024 through November 19, 2025, both dates inclusive (the "Relevant Period").

2. Bath & Body Works was founded in 1963 and became a global retail leader in personal care and home fragrance products. Bath & Body Works became a global leader in the space by providing quality, on-trend products and the newest, freshest fragrances.  Starting in the

2024 Fiscal Year,[1] Bath & Body Works began exploring new product categories, or "adjacencies," beyond its core business.  The Company's four new product categories were men's products, lips, hair, and laundry.

3.  Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the success of the Company's strategy to explore new product categories. For example, on June 4, 2024, the Company filed a Quarterly Report on Form 10-Q with the SEC for the first quarter of its 2024 Fiscal Year (the "1Q 2024 Form 10-Q"). The 1Q 2024 Form 10-Q highlighted Bath & Body Works' financial results and provided outlook for the remainder of the 2024 Fiscal Year. The 1Q 2024 Form 10-Q stated that the Company's plan to deliver growth was "***supported by newness and seasonal storytelling and continued focus on our new category adjacencies, including men's, hair, lip, and laundry, to reach new customers***."[2]

4.  On November 25, 2024, the Company published an investor presentation in connection with its financial results for the third quarter of the 2024 Fiscal Year (the "3Q 2024 Investor Presentation"). The 3Q 2024 Investor Presentation attributed Bath & Body Works' financial results to "***customers responding favorable to innovation***" including "adjacencies" of men's products, lip, and laundry.

5.  On February 27, 2025, the Company issued a press release reporting its fourth quarter and full-year financial results for its 2024 Fiscal Year (the "FY 2024 Earnings Press Release"). The FY 2024 Earnings Press Release stated that the Company's "***strategy is working,***

---

[1] Bath & Body Works' fiscal year ends on the Saturday nearest to January 31.
For the Fiscal Year from February 4, 2024 through February 1, 2025, the "2024 Fiscal Year."
For the Fiscal Year from February 2, 2025 through January 31, 2026, the "2025 Fiscal Year."
For the Fiscal Year from February 1, 2026 through January 30, 2027, the "2026 Fiscal Year."
[2] All emphasis has been added unless otherwise stated.

*and we are driving topline growth through*" among other things "*category adjacencies*."

6.     The truth began to emerge on August 28, 2025, when the Company issued a press release reporting disappointing financial results for the second quarter of the 2025 Fiscal Year (the "2Q 2025 Earnings Press Release"). The 2Q 2025 Earnings Press Release revealed earnings per diluted share of $0.30, representing a decline of 55.8% year over year and missing Bath & Body Works' guidance by $0.03. The 2Q 2025 Earnings Press Release also reported net income of $64 million, representing a 57.9% decline year over year. The 2Q 2025 Earnings Press Release further revealed lowered 2025 guidance including earnings per diluted share of $3.28 to $3.53.

7.     On this news, the Company's stock price fell $2.18, or 6.9%, from a close at $31.54 on August 27, 2025 to close at $29.36 per share on August 28, 2025, on heavy trading volume.

8.     The truth fully emerged on November 20, 2025, before the market opened, when the Company released disappointing financial results for the third quarter of the 2025 Fiscal Year. During an earnings call held that same day, Defendant Heaf revealed that the Company was reducing its focus on new product categories due to the strategy not delivering results. Specifically, Defendant Heaf stated, in relevant part:

> Let me first give you the diagnosis in 4 clear points. ***Firstly, we pursued adjacencies to attract new consumers, but that strategy has not delivered the growth we expected and it reduced focus in investing in our core categories. Secondly, collaborations that should have been used to drive excitement, energy and equity into our brand have been used to carry quarters.***
>
> ***Thirdly, as these strategies and other tactics have not delivered growth, we have relied on deeper and more frequent promotions.*** Great value and exciting deals have been part of our brand, and that will not change. However, over reliance on promotion delivers diminishing returns and erodes brand equity, and that is what has happened here. ***While all these efforts appeal to our existing consumers, they did not grow our customer base, and we have not attracted a younger consumer.***

* * *

4

Starting in the first half of next year, you will see thoughtful edits to our assortment and ***selective category exits such as hair and men's grooming as we refocus on the core.***

\* \* \*

***The problem is those adjacencies haven 't grown in the way that we had expected***, and they are not significant the ones that we are starting to take out. So we're looking at every merchant does SKUs that are not contributing that much and SKUs that are not productive, and that's where we're starting in that long tail.

\* \* \*

And then when it comes to adjacencies, I want to just clarify what I've said. ***We are no longer going to invest in adjacencies.*** We are going to invest in our core. We have told you of 2 categories that we plan to exit in hair and men's grooming.

9. On this news, the Company's stock price fell $5.22, or 24.8%, from a close at $21.04 on November 19, 2025 to close at $15.82 per share on November 20 2025, on heavy trading volume.

10. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Bath & Body Works, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company overstated the success of its growth strategy focusing on pursuing adjacencies, collaborations, and promotions; (2) as the Company's growth strategy was showing signs of weakness, the Company relied on brand collaborations to obfuscate weak financial results; and (3) as a result, it was unlikely that the Company was going to meet its financial guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants

5

willfully or recklessly caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper sales, netting proceeds of approximately ***$3.7 million.***

12. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Bath & Body Works to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2024 and October 2025, over 19.5 million shares of Bath & Body Works common stock were repurchased at artificially inflated prices, costing the Company over $629.7 million. As the Company's stock was actually worth only $15.82 per share, the price it was trading when markets closed on November 20, 2025, the Company overpaid for repurchases of its own stock by approximately $321.1 million in total.

13. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15. In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its CEO, and its Chief Financial Officer ("CFO") to a federal securities fraud class action pending in the United States District Court for the Southern District of Ohio (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who

benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Boswell, Heaf, and Boratto's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Bath & Body Works. Plaintiff has continuously held Bath & Body Works common stock at all relevant times.

### Nominal Defendant Bath & Body Works

23.     Bath & Body Works is a Delaware corporation with its principal executive offices at Three Limited Parkway, Columbus, Ohio, 43230. Bath & Body Work's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BBWI."

### Defendant Heaf

24.     Defendant Heaf has served as the Company's CEO since May 2025 and as a Company director since June 2025.

25.     The Company's website states the following about Defendant Heaf:[3]

Daniel is a passionate and innovative leader with over two decades of experience executing transformational growth strategies across consumer goods, media, retail, and technology sectors. As Head of Nike Direct, Heaf oversaw 45,000 employees in 9,000 stores across 41 countries, managing the global direct-to-consumer (DTC) business. Under his leadership, Nike's DTC business grew from $10.4 billion in 2018 to $22.3 billion in 2023. He also launched and expanded Nike's portfolio of digital apps, including the Nike App, Nike Run Club, Nike Training Club, and SNKRS. Most recently, Heaf was Chief Strategy and Transformation Officer at Nike, where he built the Company's Transformation Office and developed Nike's corporate, functional, consumer, and geography strategies. Prior to Nike, Heaf served as Senior Vice President of Digital, Digital Marketing, Customer Service &

---

[3] https://investors.bbwinc.com/governance/board-of-directors

Data at Burberry, where he helped reposition the brand as a digital innovator. At Burberry, Heaf increased digital sales from 5% to 15% and pioneered the livestreaming of fashion shows in partnership with Apple.

**Defendant Boswell**

26.     Defendant Boswell served as the Company's CEO and as a Company director from December 1, 2022 until May 16, 2025.

27.     During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Boswell made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| December 1, 2024 | 12,577 | $36.24 | $455,790 |
| March 12, 2025 | 9,474 | $28.45 | $269,535 |

Thus, in total, before the fraud was exposed, Defendant Boswell sold 22,051 shares of Company common stock on inside information, for which she received approximately $725,326 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

**Defendant Boratto**

28.     Defendant Boratto has served as the Company CFO since August 2023.

29.     During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Boratto made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|

| August 1, 2024 | 6,997 | $35.13 | $245,805 |
| March 12, 2025 | 2,742 | $28.45 | $78,010 |
| August 1, 2025 | 6,553 | $28.17 | $184,598 |

Thus, in total, before the fraud was exposed, Defendant Boratto sold 16,292 shares of Company common stock on inside information, for which she received approximately $508,413 in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

30.     The Company's website states the following about Defendant Boratto:

Boratto was appointed chief financial officer for Bath & Body Works in August 2023. She is a seasoned executive with over three decades of financial and operational experience at both public and private companies.

Prior to joining Bath & Body Works, Boratto served as chief financial officer of Opentrons Labworks, a privately held life sciences company. Boratto also spent 11 years at CVS Health, most recently serving as executive vice president and chief financial officer. During her tenure at CVS Health, Boratto held roles with increasing responsibility and was critical to the development of the company's growth plan, including investment in digitization efforts and new businesses, and supporting the integration of CVS Health's transformative, $69 billion acquisition of Aetna. Earlier in her career, Boratto spent 20 years at Merck & Co., Inc. in a number of leadership roles, including vice president, U.S. market finance leader.

Boratto currently serves on the United Parcel Service (UPS) board of directors, including as chair of UPS's audit committee. Boratto earned a Master of Business Administration from Drexel University and a Bachelor of Science in Accounting and Economics from Rutgers University.

**Defendant Bogliolo**

31.     Defendant Bogliolo has served as a Company director since 2022. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Human Capital and Compensation Committee.

32.     The Company's website states the following about Defendant Bogliolo:

Bogliolo, born in Italy, is the Chair and Board Director of Audemars Piguet, a Swiss manufacturer of luxury mechanical watches and clocks, headquartered in Le Brassus, Switzerland. He also serves as a Director of Hyatt Hotels Corporation, a leading global hospitality company. Previously, he was the Chief Executive Officer and director of Tiffany & Co. ("Tiffany"), a luxury jewelry and specialty retailer, serving in such role from October 2017 through the acquisition of Tiffany by LVMH Moët Hennessy Louis Vuitton SE ("LVHM") in January 2021. Prior to joining Tiffany, Bogliolo served as Chief Executive Officer and director of Diesel SpA, an international fashion brand that is part of the OTB Group, from 2013 to 2017, and in senior roles with LVMH from 2011 to 2013, including as Chief Operating Officer, North America, for Sephora USA and Executive Vice President and Chief Operating Officer, Bulgari.

**Defendant Brady**

33.     Defendant Brady has been a Company director since 2023. She also serves as a member of the Human Capital and Compensation Committee and the Nominating and Governance Committee.

34.     The Company's website stated the following about Defendant Brady:

Brady served as President, Grocery & Snacks at Conagra Brands, Inc. ("Conagra"), a publicly traded consumer packaged food goods company, from June 2022 to February 2025, where she lead Conagra's modernization and growth of Conagra's $5 billion grocery and snacks portfolio. Prior to joining Conagra in 2022, Brady served as Senior Vice President and Chief Digital Customer Engagement Officer at McDonald's Corporation ("McDonald's") where she oversaw some of McDonald's most significant growth drivers, including delivery of loyalty, digital ordering and pickup and personalized communications. At McDonald's, she also previously served as Senior Vice President, Corporate Strategy, Business Development and Innovation. Prior to joining McDonald's, Brady served as a Managing Director and Senior Partner at The Boston Consulting Group, where she worked for nearly 20 years, and earlier in her career held positions with General Mills, Monitor Group and Trammell Crow Company. Brady was recognized among the 2021 Power List: 50 people who represent the best in restaurant leadership and Power 20: Emerging Leaders in 2020. She was also recognized as one of the Top 100 Chief Digital Officers of 2022 by Hewlett Packard Enterprise. Brady has a BA, Economics from The Wharton School at the University of Pennsylvania, and an MBA from the Stanford University Graduate School of Business.

**Defendant Hondal**

11

35.      Defendant Hondal has served as a Company director since 2021. She also serves as the Chair of the Human Capital and Compensation Committee and as a member of the Audit Committee.

36.      The Company's website states the following about Defendant Hondal:

Hondal retired as President of Loyalty and Engagement at Mastercard Inc. (''Mastercard''), a global technology company in the payments industry, in 2022 after serving in this position since 2018. She was also a member of Mastercard's management committee. In that role, she led the expansion of consumer benefits, performance-based and personalized marketing services, loyalty and rewards programs, and data and technology services for enterprises worldwide ranging from financial services institutions, retail and commerce, hospitality and fintechs. From 2015 to 2018, Hondal served as a global executive leader for Consumer Credit products, Loyalty Services, Marketing and Digital Services and was responsible for innovative new product development, strategic partnerships and data services via direct and partners' marketing channels. From 2011 to 2015, she was Executive Vice President of Products, Marketing and Advisors within the Latin America region. Hondal also spent 17 years at the American Express Company in global and regional roles within its consumer services division in general management, marketing and finance roles. Since September 2020, she has served as a director of Equitable Holdings, Inc., a financial service holding company comprised of two principal franchises, Equitable and AllianceBernstein. She serves on the board of the Florida International University Foundation as co-chair of the marketing committee. She was previously a board observer for Flybits, a Canadian contextual marketing fintech.

**Defendant Lee**

37.      Defendant Lee has served as a Company director since 2021. She also serves as a member of the Human Capital and Compensation Committee and as a member of the Nominating and Governance Committee.

38.      The Company's website states the following with respect to Defendant Lee:

Lee served as President, Warner Music Artist and Fan Experiences at Warner Music Group Corp. ("Warner Music Group"), a publicly traded music entertainment company, from June 2021 to June 2023, where she led an in-house creative agency for the Warner Recorded Music roster as well as for third-party musical artists. Prior to joining Warner Music Group, Lee was the Chief Fan Officer for the National Basketball Association, Inc. (the "NBA") from March 2020 through May 2021, where she oversaw brand, creative and multiplatform fan marketing globally

12

and was charged with elevating brand perceptions, cultural connection and fan engagement. Prior to joining the NBA in 2020, Lee served for four years as Global Vice President, Partner Solutions at Spotify Technology S.A., where she was responsible for developing go-to-market strategy and growing global revenue across music, podcasts and high-impact digital experiences. Prior to Spotify, Lee served as Global Vice President, Commercial Marketing at Vevo LLC. She also spent seven years at AT&T Inc. and served as Vice President of Product Marketing and Innovation for AT&T AdWorks after beginning her career at Showtime Networks Inc.

**Defendant Nash**

39. Defendant Nash has served as a Company director and the Chair of the Board since 2019.

40. During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Nash made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| June 18, 2024 | 48,000 | $41.50 | $1,992,120 |
| March 10, 2025 | 16,776 | $30.46 | $510,997 |

Thus, in total, before the fraud was exposed, Defendant Nash sold 64,776 shares of Company common stock on inside information, for which she received approximately $2.5 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

41. The Company's website states the following about Defendant Nash

Nash serves as Chair of the Board of Bath & Body Works, Inc. She served as Executive Chair of Bath & Body Works, Inc. from February 2022 to January 2023 and as the Interim Chief Executive Officer from May to November 2022. Prior to being appointed Executive Chair, she served as Chair of the Board between May 2020 and February 2022 after having joined the Board as an independent director

13

in May 2019. Nash is also, chief executive officer and owner of privately held Novagard Solutions, an innovator and manufacturer of silicone sealants and coatings and hybrid and foam solutions for the Building Systems, Electronics, EV and Battery and Industrial and Transportation markets.

Nash spent nearly 30 years in investment banking at JPMorgan Chase & Co. (and predecessor companies), a financial services firm, retiring as Vice Chairman of Global Investment Banking in July 2005. She served on the board of directors of Knoll, Inc., a designer and manufacturer of lifestyle and workplace furnishing, textiles and fine leathers, from 2006 through its acquisition by Herman Miller, Inc. in 2021 and privately held Irving Oil Company through March 2022.

Nash currently serves on the boards of directors of Blackbaud, Inc., a software company providing technology solutions for the not-for-profit industry, and privately held HBD Industries, Inc., a manufacturer and supplier of general purpose and application-engineered industrial products. Nash is Trustee of the New York-Presbyterian Hospital, a member of the Smithsonian Tropical Research Institute (STRI), Panama and the Chair of the International Advisory Board of the Montreal Museum of Fine Arts. She also served as a member of the National Board of the Smithsonian Institution through 2022. Nash holds a BA in political science from Vassar College.

**Defendant Rajlin**

42.     Defendant Rajlin has served as a Company director since 2022. He also serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee.

43.     The Company's website states the following about Defendant Rajlin:

Rajlin, born in Argentina, has served as the Treasurer of Alphabet Inc. ("Alphabet"), a multinational technology company, and its subsidiary Google LLC ("Google") since October 2018. In Rajlin's role with Alphabet, he oversees over $100 billion of investments, corporate finance policy and financial risk management. He is also a key executive overseeing Google's sustainability strategy and diversity, equity and inclusion work. Prior to joining Alphabet, Rajlin served as Corporate Treasurer and Chief Risk Officer from February 2013 through September 2017 and as Chief Financial Officer, Products and Services from October 2017 through September 2018, in each case at Mastercard, and held various roles with increasing levels of responsibility with General Motors Company before joining Mastercard. Rajlin holds a BS, Economics from Universidad Torcuato Di Tella in Argentina and an MBA from Columbia University.

**Defendant Steinour**

14

44.     Defendant Steinour has served as a Company director since 2014. He also serves as a member of the Audit Committee and the Human Capital and Compensation Committee.

45.     The Company's website states the following about Defendant Steinour

Steinour has been the Chairman, President and Chief Executive Officer of Huntington Bancshares Incorporated, a regional bank holding company, since 2009. From 2008 to 2009, Steinour was a Managing Partner in CrossHarbor Capital Partners, LLC, a recognized leading manager of alternative investments. Steinour was with Citizens Financial Group from 1992 to 2008, where he served in various executive roles, including President from 2005 to 2007 and Chief Executive Officer from 2007 to 2008. Steinour also serves as a supervisory board member of The Clearing House, a real-time payments platform. He previously served as a trustee of Liberty Property Trust, a real estate investment trust, from 2010 to 2014, as a director of the Federal Reserve Bank of Cleveland, from 2017 to 2019, and as a director of Exelon Corporation, a utility services holding company, from 2007 to 2020.

**Defendant Symancyk**

46.     Defendant Symancyk has served as a Company director since 2021. He also serves as a member of the Audit Committee and the Nominating and Governance Committee.

47.     The Company's website states the following about Defendant Symancyk:

Symancyk is Chief Executive Officer and a director of Signet Jewelers Limited. Prior to joining Signet Jewelers Limited in November 2024, Symancyk served as President and Chief Executive Officer and a director of PetSmart LLC, a large specialty pet retailer, from June 2018 through September 2024. From 2015 to June 2018, Symancyk was the Chief Executive Officer of Academy Sports and Outdoors, Inc., a sporting goods and outdoor recreation retailer. Symancyk has over 30 years of retail industry experience across a diverse range of categories and has spent his career in large-scale organizations, including roles of increasing responsibility with each of Academy Sports + Outdoors, Meijer and Walmart Stores. Symancyk also served on the board of directors of Chewy, Inc., an online retailer for pet products, supplies and prescriptions, from April 2019 through July 2021, and GameStop Corp., from March 2020 to June 2021.

**Defendant Voskuil**

48.     Defendant Voskuil has served as a Company director since 2023. He also serves as the Chair of the Audit Committee and as a member of the Human Capital and Compensation Committee.

49.     The Company's website stated the following about Defendant Voskuil:

Voskuil joined The Hershey Company ("Hershey") in 2019 and is responsible for leading Hershey's global finance organization, including financial planning and analysis, accounting and reporting, tax, treasury, internal audit and investor relations.  Prior to joining Hershey, he served as Senior Vice President and Chief Financial Officer of Avanos Medical (previously Halyard Health), a global medical device company serving healthcare needs in more than 90 countries, after he led Avanos Medical's successful spin-off from Kimberly-Clark Corporation in 2014.  Prior to Avanos, he worked for 23 years at Kimberly-Clark Corporation, including serving as Chief Financial Officer of Kimberly-Clark International and Vice President and Treasurer of Kimberly-Clark Corporation.  Voskuil has a BBA in Finance from the University of Wisconsin and a Master's Degree in Management from the Stanford Graduate School of Business.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as officers, directors, and/or fiduciaries of Bath & Body Works, the Individual Defendants owed Bath & Body Works and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Bath & Body Works in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Bath & Body Works and its shareholders so as to benefit all shareholders equally.

51.     Each director and officer of the Company owes to Bath & Body Works and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bath & Body Works, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Bath & Body Works were required to exercise reasonable and prudent supervision over the management, policies, controls,

and operations of the Company.

54.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Bath & Body Works, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Bath & Body Works's Board at all relevant times.

55.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56.     To discharge their duties, the officers and directors of Bath & Body Works were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Bath & Body Works were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio, Delaware, and the United States, and pursuant to Bath & Body Works's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Bath & Body Works conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Bath & Body Works and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Bath & Body Works's operations would comply with all applicable laws and Bath & Body Works's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the

18

Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.     Each of the Individual Defendants further owed to Bath & Body Works and the shareholders the duty of loyalty requiring that each favor Bath & Body Works's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Bath & Body Works and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, directorial, and controlling positions with Bath & Body Works, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Bath & Body Works.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Bath & Body Works was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bath & Body Works, and was at all times acting within the course and scope of such agency.

**BATH & BODY WORKS' CODE OF CONDUCT**

66.     Bath & Body Works' Code of Conduct states "Bath & Body Works directors, officers and associates must comply with our Code of Conduct."

67.     In the section titled "Leading With Our Values: Our Commitment and Accountability," in a subsection titled "Leading With Values," the Code of Conduct states:

> We are committed to living by our values, doing what's right and acting with integrity everywhere we do business regardless of the circumstances. We all have a responsibility to comply with the law and follow the Code and other company policies. If you violate the law, our Code or other company policies, you may be subject to disciplinary action which may include terminating your employment, even if the violation occurred off company premises or off-the-clock.

68.      In the same section, under a subheading titled "Additional Responsibilities For Leaders," the Code of Conduct states:

> All managers and senior leaders are responsible for creating an environment that encourages compliance with our Code of Conduct and other company policies. Supervision of responsible business practices is as important as supervision of performance and business results. Managers are held to a higher standard of conduct, and we expect they will observe those higher standards even when off-site. To help us uphold our values and maintain a culture of compliance, you should:
>
> • act as a role model and encourage your teams to act with integrity at all times;
> • encourage open communication so associates can ask questions and raise concerns;
> • ensure your teams understand and follow the Code and complete all training;
> • promote an inclusive environment that welcomes and values differences;
> • actively support and follow the Anti-Retaliation Policy;

21

• report incidents of misconduct or potential violations of the law or policy;
• when appropriate, address behavior that does not align with the Code and our values in the moment;
• and escalate reports and get help from Human Resources or Global Ethics & Compliance when needed.

69.     In the same section, under a subheading titled "Waivers," the Code of Conduct states:

Our Code is approved by our Board of Directors. The Human Capital and Compensation Committee of the Board of Directors must approve a waiver of any provision of the Code for any executive in the position of Senior Vice President and above. All other requests for waivers of the Code must be approved by the Chief Legal Officer. Any waivers granted must be in writing.

70.     In a section titled Leading With Our Values: You and the Workplace," under a subheading titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

We avoid conflicts of interest. A conflict of interest is any activity, financial interest or personal or professional relationship that interferes (or may appear to interfere) with your ability to make objective decisions on behalf of the company. Conflicts of interest create risks for our company, and we all have a duty to avoid situations that could create – or even appear to create – conflicts of interest. Your own actions, financial and business interests or relationships may create conflicts of interest. You must report potential conflicts of interest as part of the annual survey process and as they may arise to your manager, Human Resources partner or Global Ethics & Compliance at EthicsandCompliance@BBW.com.

You should never use company property, information or your position at Bath & Body Works for personal gain. You should never compete with the company, either by engaging in the same line of business or by taking away any opportunity for sales or purchase of products, services or interests. Situations involving conflicts of interest are not always obvious or easy to resolve. This section describes some of the more common circumstances you might encounter.

Financial Interests
A conflict of interest can arise when your judgment could be influenced – or appear to be influenced – by potential personal financial gain. For example, if you have a financial interest in a company that does business with Bath & Body Works and your role directly or indirectly involves that company, you may have a conflict of interest. If you have a financial interest in a supplier that might pose a conflict of interest, you must disclose it to Global Ethics & Compliance.

71.     In a section titled "Leading With Our Values: Our Company and You:" in a

22

subsection titled "Financial Integrity and Accurate Records," the Code of Conduct states:

> We ensure that company records are accurate, timely and completely reflect actual transactions and events. Our shareholders, customers, fellow associates, the public and government entities are entitled to accurate and truthful business records. We use company assets appropriately and reflect all expenditures, transactions, assets and liabilities properly in our business records. It is your responsibility to create accurate and complete records and follow internal controls. Never falsify any record or document for any reason. Do not attempt to circumvent internal controls and processes. For purposes of this policy, the term "records" includes any information we make or keep, regardless of the format. If you are unsure about what is required, talk to your manager or Global Ethics & Compliance.

72. In the same section, under a subheading titled "Protecting Personal and Business Information," the Code of Conduct states, in relevant part:

> We protect our information assets from security threats, and safeguard our associates, customers, vendors, and contractors from privacy violations. We comply with applicable laws and implement recognized security standards to protect information in accordance with applicable law, our policies and our company values. Our obligation to protect information extends to information in both paper and electronic formats. You must collect and use information only as needed to conduct company business and store that information for only as long as necessary for legal or legitimate business purposes.

73. In the same section, under a subheading titled "Inside Information," the Code of Conduct states:

> We comply with insider trading laws. Inside information is information (about our company or another company) that is not public and is also material – that is, information that a reasonable investor would consider important in deciding whether to buy, sell or hold stock. Company policies and the law strictly limit what we can do while we hold inside information. Examples of material information include earnings and other financial results, sales data, inventory levels, management changes, plans for an acquisition, sale or merger and business strategies.
>
> You may not trade Bath & Body Works stock and other securities while you possess material, non-public information about the company. This applies to all Bath & Body Works associates and their families. Trading includes buying, selling, and shifting account balances, investment allocations and investment directions in company plans.
>
> In addition, you may not share inside information with anyone unless they have a

23

business need to know and you may never share inside information outside of Bath & Body Works.

74.	In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## BATH & BODY WORKS' AUDIT COMMITTEE CHARTER

75.	The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states the purpose of the Audit Committee is, in relevant part:

• Oversee the integrity of the Company's financial statements and internal controls;

• Review and evaluate the qualifications, independence and performance of the Company's independent auditors;

• Review and evaluate the performance of the Company's internal audit function;

• Assist the Board with overseeing the Company's risk management framework, including reviewing the Company's policies and practices with respect to risk identification, assessment, mitigation and management; and

• Oversee the Company's compliance with legal and regulatory requirements, including oversight of the Company's Code of Conduct.

76.	In a section titled "Authority and Responsibilities," under a subheading titled "Financial Statements, Disclosure and Certain Related Matters," the Audit Committee Charter

24

describes the responsibilities of the Audit Committee, in relevant part:

• The Committee shall review and discuss with management, the internal auditors and the independent auditors (as may be required by the rules of the New York Stock Exchange and other applicable laws and regulations and, in addition, as the Committee deems it appropriate), the annual audited financial statements, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K, and the quarterly financial statements, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q.

• The Committee shall review with management, the internal auditors and the independent auditors, in separate meetings whenever the Committee deems appropriate:

o any analyses or other written communications prepared by management, the internal auditors and/or the independent auditors setting forth significant financial reporting issues, estimates, judgments and methodologies relating to the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements and the treatment preferred by the independent auditors; o the critical accounting policies and practices of the Company;

o the clarity of financial disclosures made by the Company;

o information regarding any second opinions sought by management from an accounting firm other than the Company's independent auditors with respect to the accounting treatment of a particular event or transaction;

o any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

o regulatory and accounting initiatives or actions applicable to the Company, including changes and prospective changes in accounting pronouncements, or any off-balance sheet structures, if any, and their impact on the Company's financial statements.

• The Committee may review the Company's financial information and earnings guidance provided to analysts, rating agencies, governmental authorities or the public, and the policies generally with respect to the foregoing. and the Committee may also review any of the Company's other financial disclosures, such as earnings press releases and presentations, as it deems appropriate, including in each case the

25

type and presentation of information to be disclosed and the use of non-GAAP financial information.

• The Committee shall periodically (at least quarterly), in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, review the Company's internal controls and disclosure controls and procedures, including whether there are any significant deficiencies in the design or operation of such controls and procedures, material weaknesses in such controls and procedures, any corrective actions taken with regard to such deficiencies and weaknesses and any fraud involving management or other associates with a significant role in such controls and procedures.

• The Committee shall review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on the effectiveness of internal control over financial reporting.

* * *

• The Committee shall prepare, with the assistance of counsel, the audit committee report that SEC rules require to be included in the Company's annual proxy statement.

77.     In the same section, under a subheading titled "Risk Management Oversight," the Audit Committee Charter describes the responsibilities of the Audit Committee as:

• The Committee shall assist the Board with overseeing the Company's risk management framework, including reviewing the Company's policies and practices with respect to risk identification, assessment, mitigation and management.

• The Committee shall discuss with management the Company's major financial risk exposures and the steps that have been taken to monitor, minimize exposure and control such exposures, and report to the Board on such matters.

• The Committee shall review the Company's policies and practices with respect to cybersecurity, data security, technology, privacy and artificial intelligence risk exposures, and report to the Board on such matters.

• The Committee shall review the Company's anti-fraud programs and controls with management, and report to the Board on such matters.

78.     In the same section, under a subheading titled "Other Compliance Matters," the Audit Committee Charter describes the responsibilities of the Audit Committee as:

26

• The Committee shall review any significant complaints regarding accounting, internal accounting controls or auditing matters received pursuant to such procedures.

***

• The Committee shall review periodically with management, including the Chief Legal Officer, and the independent auditors significant legal or regulatory matters affecting the Company, as well as significant matters arising under the Company's Code of Conduct.

• The Committee shall oversee the Ethics & Compliance function of the Company.

• The Committee shall receive and review, on at least a quarterly basis, reports from the Ethics & Compliance function.

• The Committee shall be empowered to investigate any matter brought to its attention with full access to all Company books, records and personnel, using special counsel or outside experts as necessary or appropriate.

79.     In the same section, under a subheading titled "Reporting to the Board," the Audit

Committee Charter describes the responsibilities of the Audit Committee in relevant part, as:

The Committee shall report to the Board periodically. This report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the qualifications, independence and performance of the Company's independent auditors, the performance of the internal audit function, any funding requirements for the outside auditors, Committee and any advisors retained by the Committee to assist it in its responsibilities and any other matters that the Committee deems appropriate or is requested to be included by the Board.

* * *

At least annually, the Committee shall review the operations and effectiveness of the Ethics & Compliance function of the Company and report to the Board on such evaluation.

 The Committee will annually review and reassess the adequacy of this Charter and recommend any proposed changes to the Board.

80.     The Individual Defendants who served on the Company's Audit Committee during

the Relevant Period violated the Audit Committee Charter by engaging in or permitting the

27

Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

81.     Bath & Body Works was founded in 1963 and became a global retail leader in personal care and home fragrance products. Bath & Body Works became a global leader in the space by providing quality, on-trend products and the newest, freshest fragrances.

82.     Starting in the 2024 Fiscal Year, Bath & Body Works began exploring new product categories, or "adjacencies," beyond its core business.   The Company's four new product categories were men's products, lips, hair, and laundry.

**False and Misleading Statements**

*June 4, 2024 Financial Reports*

83.     The Relevant Period begins on June 4, 2024, when the Company issued a press release reporting its financial results for the first quarter of its 2024 Fiscal Year (the "1Q 2024 Earnings Press Release"). The 1Q 2024 Earnings Press Release touted the Company's financial

results, stating that Bath & Body Works was only negatively impacted by "weaker than expected results from certain international markets."

84.     Specifically, the 1Q 2024 Earnings Press Release stated:

Bath & Body Works Reports First Quarter 2024 Results

Net Sales of $1.4 Billion Exceeded Guidance

Diluted Earnings Per Share of $0.38 Exceeded Guidance,

up 9% on a GAAP Basis and 15% on an Adjusted Basis Compared to Prior Year

* * *

First Quarter 2024 Results

The company reported net sales of $1,384 million for the quarter ended May 4, 2024, a decrease of 0.9% compared to net sales of $1,396 million for the quarter ended April 29, 2023. ***The change in year-over-year net sales benefited by approximately 200 basis points from the shifted fiscal calendar as expected, offset by an impact of approximately 170 basis points resulting from weaker than expected results from certain international markets.***

The company reported earnings per diluted share of $0. 38 for the first quarter 2024, compared to $0. 35 for the same period of the prior year. First quarter operating income was $187 million compared to $181 million last year, and net income was $87 million compared to $81 million last year.

* * *

| | First Quarter | |
| | 2024 | 2023 |
|---|---|---|
| Net Sales | $ 1,384 | $ 1,396 |
| Costs of Goods Sold, Buying and Occupancy | (778) | (800) |
| Gross Profit | 606 | 596 |
| General, Administrative and Store Operating Expenses | (419) | (415) |
| Operating Income | 187 | 181 |
| Interest Expense | (82) | (89) |
| Other Income | 13 | 20 |
| Income Before Income Taxes | 118 | 112 |
| Provision for Income Taxes | 31 | 31 |
| Net Income | $ 87 | $ 81 |
| Net Income per Diluted Share | $ 0.38 | $ 0.35 |
| Weighted Average Diluted Shares Outstanding | 226 | 230 |

29

85. The same day, the Company published an investor presentation further discussing its financial results for the quarter (the "1Q 2024 Investor Presentation").

86. The 1Q 2024 Investor Presentation highlighted the Company's strong financial results were driven by "strong floorsets" and "strong execution within our fulfillment operations."

87. The 1Q 2024 Investor Presentation stated although there was "weaker-than-expected wholesale revenue," there was "year-over-year growth drivers included: Lip, Hair, Men 's and Fine Fragrance Mist" and that "Men's continued to be one of our fastest growing categories in Body Care."

88. Specifically, the 1Q 2024 Investor Presentation stated, in relevant part:



\* \* \*

89. Also on June 4, 2024, the Company filed the 1Q 2024 Form 10-Q, which was signed by Defendant Boratto. The 1Q 2024 Form 10-Q contained certifications pursuant to Rules

30

13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX")

signed by Defendants Boswell and Boratto attesting to the accuracy of the 1Q 2024 Form 10-Q

and that the 1Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit

to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this

report[.]"

90.     The 1Q 2024 Form 10-Q continued to tout the Company's financial result and its

focus on new category adjacencies. Specifically, the 1Q 2024 Form 10-Q stated, in relevant part:

Outlook

We anticipate continuing macroeconomic pressures as well as continuing post-pandemic normalization of candles and sanitizers in fiscal 2024. We expect the normalization to moderate as we move through the year. We plan to deliver growth from our core categories, supported by newness and seasonal storytelling and continued focus on our new category adjacencies, including men's, hair, lip, and laundry, to reach new customers.

\* \* \*

The following table provides a disaggregation of Net Sales for the first quarters of 2024 and 2023:

|  | First Quarter | |
| --- | --- | --- |
|  | 2024 | 2023 |
|  | (in millions) | |
| Stores - U.S. and Canada (a) | $ 1,065 | $ 1,034 |
| Direct - U.S. and Canada | 261 | 280 |
| International (b) | 58 | 82 |
| **Total Net Sales** | $ 1,384 | $ 1,396 |

(a)Results include fulfilled buy online-pick up in store orders.
(b)Results include royalties associated with franchised stores and wholesale sales.

The Company's net sales outside of the U.S. include sales from Company-operated stores and its e-commerce site in Canada, royalties associated with franchised stores and wholesale sales. Certain of these sales are subject to the impact of fluctuations in foreign currency. The Company's net sales outside of the U.S. totaled $126 million and $145 million for the first quarters of 2024 and 2023, respectively.

31

***August 28, 2024 Financial Reports***

91.     On August 28, 2024, the Company issued a press release reporting its financial results for the second quarter of its 2024 Fiscal Year (the "2Q 2024 Earnings Press Release").

92.     The 2Q 2024 Earnings Press Release stated, in relevant part:

Bath & Body Works Reports Second Quarter 2024 Results

Net Sales of $1.5 Billion, In Line -with Guidance

Earnings Per Diluted Share of $0.68; Adjusted Earnings Per Diluted Share of $0.37, Exceeded Guidance

Updates Fiscal Year 2024 Guidance

Increases Full-Year Expected Share Repurchases to $400 million from $300 million

* * *

Second Quarter 2024 Results

The company reported net sales of $1, 526 million for the quarter ended August 3, 2024, a decrease of 2. 1% compared to net sales of $1, 559 million for the quarter ended July 29, 2023.

The company reported earnings per diluted share of $0.68 for the second quarter 2024, compared to $0.43 for the same period of the prior year. Second quarter operating income was $183 million compared to $188 million last year, and net income was $152 million compared to $99 million last year.

* * *

32

|  | Second Quarter | |
|---|---|---|
|  | 2024 | 2023 |
| Net Sales | $ 1,526 | $ 1,559 |
| Costs of Goods Sold, Buying and Occupancy | (900) | (937) |
| Gross Profit | 626 | 622 |
| General, Administrative and Store Operating Expenses | (443) | (434) |
| Operating Income | 183 | 188 |
| Interest Expense | (77) | (86) |
| Other Income | 47 | 25 |
| Income Before Income Taxes | 153 | 127 |
| Provision for Income Taxes | 1 | 28 |
| Net Income | $ 152 | $ 99 |
| Net Income per Diluted Share | $ 0.68 | $ 0.43 |
| Weighted Average Diluted Shares Outstanding | 223 | 229 |

93. The same day, the Company published an investor presentation further discussing its financial results for the quarter (the "2Q 2024 Investor Presentation").

94. The 2Q 2024 Investor Presentation reaffirmed the Company's strong financial results, attributing its performance to "semi-annual sale (SAS) performance" and "solid execution on our Fuel for Growth initiatives." Although the Company was negatively impacted by a "more value-conscious consumer due to choppier macroeconomic environment[,]" the Company stated that the Men's Hair, Lip and Laundry segments were performing well.

95. Specifically, the 2Q 2024 Investor Presentation stated, in relevant part:



Taking actions to drive growth in our core portfolio, extend our reach to new adjacencies and markets, use our agile model to adapt to a dynamic environment, and optimize our business to reduce costs and expand margin

* * *

33



* * *



96.     Also on August 28, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q 2024 Form 10-Q"), which was signed by Defendant Boratto. The 2Q 2024 Form 10-Q contained SOX certifications signed by Defendants Boswell and Boratto attesting to the accuracy of the 2Q 2024 Form 10-Q and that the 2Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements

34

were made, not misleading with respect to the period covered by this report[.]"

97. The 2Q 2024 Form 10-Q reaffirmed the Company's financial results and stated that decline in net sales value was driven by "customers [who had] become increasingly cautious in their spending" and customers choosing "buy online pick up in store" options.

98. The 2Q 2024 Form 10-Q also stated that the Company was "extending our reach through new category adjacencies," stating, in relevant part:

Outlook

As we look ahead to the remainder of the year, we anticipate continuing pressures given the first-half sales trends and the choppier macroeconomic environment. We are focused on executing with precision, continuing to bring newness to customers and demonstrating our strong value proposition across our product assortment. Our strategic priorities remain our core categories, supported by newness and innovation, and extending our reach through new category adjacencies, including men's, hair, lip, and laundry, and expansion of off-mall and international locations.

* * *

The following table provides Net Sales for the second quarter of 2024 in comparison to the second quarter of 2023:

35

|  | 2024 | 2023 | % Change |
|---|---|---|---|
|  | (in millions) | | |
| Stores - U.S. and Canada (a) | $ 1,140 | $ 1,144 | (0.3 %) |
| Direct - U.S. and Canada | 297 | 329 | (9.7 %) |
| International (b) | 89 | 86 | 2.2 % |
| **Total Net Sales** | $ 1,526 | $ 1,559 | (2.1 %) |

(a)Results include fulfilled buy online-pick up in store ("BOPIS") orders.
(b)Results include royalties associated with franchised stores and wholesale sales.

For the second quarter of 2024, Net Sales decreased $33 million, or 2.1%, to $1.526 billion, compared to the second quarter of 2023. Direct Net Sales decreased $32 million, or 9.7%, driven by a decline in fulfilled orders, which was primarily due to our customers continuing to select our BOPIS option (which is recognized as store Net Sales) and a decline in website traffic. Stores Net Sales decreased $4 million, or 0.3%, due to a decline in total transactions as we have seen our customers become increasingly cautious in their spending. International Net Sales increased $3 million, or 2.2%, driven by increased product shipments.

***November 25, 2024 Financial Reports***

99.     On November 25, 2024, the Company issued a press release reporting its financial results for the third quarter of its 2024 Fiscal Year (the "3Q 2024 Earnings Press Release"). The 3Q 2024 Earnings Press Release stated, in relevant part:

Bath & Body Works Reports Third Quarter 2024 Results

Net Sales of $1.6 Billion, Increased 3%; Earnings Per Diluted Share of $0. 49, Both Exceeding Guidance Updates Fiscal Year 2024 Guidance

* * *

Third Quarter 2024 Results

The company reported net sales of $1,610 million for the quarter ended November 2, 2024, an increase of 3. 0% compared to net sales of $1, 562 million for the quarter ended October 28, 2023.

The company reported earnings per diluted share of $0. 49 for the third quarter 2024, compared to $0.52 last year. Third quarter operating income was $218

36

million compared to $221 million last year, and net income was $106 million compared to $119 million last year.

* * *

| | Third Quarter | | Year-to-Date | |
|---|---|---|---|---|
| | 2024 | 2023 | 2024 | 2023 |
| Net Sales | $ 1,610 | $ 1,562 | $ 4,520 | $ 4,517 |
| Costs of Goods Sold, Buying and Occupancy | (910) | (880) | (2,587) | (2,618) |
| Gross Profit | 700 | 682 | 1,933 | 1,899 |
| General, Administrative and Store Operating Expenses | (482) | (461) | (1,345) | (1,310) |
| Operating Income | 218 | 221 | 588 | 589 |
| Interest Expense | (77) | (84) | (236) | (259) |
| Other Income | 4 | 22 | 65 | 68 |
| Income Before Income Taxes | 145 | 159 | 417 | 398 |
| Provision for Income Taxes | 39 | 40 | 72 | 99 |
| Net Income | $ 106 | $ 119 | $ 345 | $ 299 |
| Net Income per Diluted Share | $ 0.49 | $ 0.52 | $ 1.55 | $ 1.31 |
| Weighted Average Diluted Shares Outstanding | 219 | 228 | 223 | 229 |

100.    The same day, the Company published the 3Q 2024 Investor Presentation. The 3Q 2024 Investor Presentation reaffirmed Bath & Body Works financial results which were driven by "customers responding favorable to innovation." The 3Q 2024 Investor Presentation also highlighted the Company's growth strategy through adjacencies, stating, in relevant part:




* * *

37



101.     Also on August 28, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of 2024 (the "3Q 2024 Form 10-Q"), which was signed by Defendant Boratto. The 3Q 2024 Form 10-Q contained SOX certifications signed by Defendants Boswell and Boratto attesting to the accuracy of the 3Q 2024 Form 10-Q and that the 3Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

102.     The 3Q 2024 Form 10-Q attributed a decline in the certain net sales of the Company to "franchise partners affected by the war in the Middle East" and customers selecting a buy online pick up in store option for delivery. The 3Q 2024 Form 10-Q continued to highlight Bath & Body Work's strategy, including "***extending our reach by expanding and diversifying our product portfolio through category adjacencies***."

103.     Specifically, the 3Q 2024 Form 10-Q stated, in relevant part:

Outlook

As we look ahead to the fourth quarter, the market remains competitive with a value conscious consumer. Our strategic priorities are focused on driving revenue growth

38

through our core categories, supported by newness and innovation to create customer demand and convey the quality and value of our products. We are also focused on extending our reach by expanding and diversifying our product portfolio through category adjacencies, including men's, hair, lip, and laundry, and expansion of off-mail stores and international geographies.

* * *

The following table provides Net Sales for the third quarter of 2024 in comparison to the third quarter of 2023:

|  | 2024 | 2023 | % Change |
|---|---|---|---|
|  | (in millions) | | |
| Stores - U.S. and Canada (a) | $ 1,220 | $ 1,168 | 4.4 % |
| Direct - U.S. and Canada | 321 | 317 | 1.5 % |
| International (b) | 69 | 77 | (11.1 %) |
| **Total Net Sales** | $ 1,610 | $ 1,562 | 3.0 % |

_____

(a)Results include fulfilled buy online-pick up in store ("BOPIS") orders.
(b)Results include royalties associated with franchised stores and wholesale sales.

For the third quarter of 2024, Net Sales increased $48 million, or 3.0%, to $1.610 billion, compared to the third quarter of 2023. Stores Net Sales increased $52 million, or 4.4%, due to new store growth, an increase in BOPIS fulfilled orders and the benefit of the shifted fiscal calendar, partially offset by the decline in average dollar sale. Direct Net Sales increased $4 million, or 1.5%, primarily driven by an increased average order size, partially offset by a decline in fulfilled orders, which was primarily due to our customers continuing to select our BOPIS option (which is recognized as store Net Sales). International Net Sales decreased $8 million, or 11.1%, driven by a decline in wholesale shipments to our franchise partners affected by the war in the Middle East.

### February 27, 2025 Financial Reports

104.    On February 27, 2025, the Company issued the FY 2024 Earnings Press Release. The FY 2024 Earnings Press Release touted the Company's strategy, stating that the Company's "***strategy is working, and we are driving topline growth through,***" among other things, "***category adjacencies***." The FY 2024 Earnings Press Release also attributed negative impacts to the Company's financials to a change to a 52-week fiscal year.

39

105.    Specifically, the FY 2024 Press Release stated, in relevant part:

Bath & Body Works Reports 2024 Fourth Quarter and FuIl-Year Results and Provides 2025 Guidance

● Fourth quarter 2024 net sales of $2. 8 billion and earnings per diluted share of $2.09, both exceeding guidance

● Fourth quarter net sales performance driven by strong traffic and conversion, building on Q3 momentum

* * *

 Gina Boswell, CEO of Bath & Body Works, commented, "Our team delivered strong performance that exceeded expectations on both the top and bottom line in the critical fourth quarter. This success was driven by our product innovation, strong execution and the outstanding customer experience provided by our associates."

Boswell added, "***Our strategy is working, and we are driving topline growth through product innovation, enhanced marketing and technology, and by extending our reach through category adjacencies and international expansion***. Despite complex challenges facing the broader retail sector, we ended the second half of the year strong. As we enter 2025, we have a lot to be excited about, and we are eager to build on our momentum."

* * *

Full-Year 2024 Results

Net sales decreased 1.6% to $7,307 million for the 52-week fiscal year ended February 1, 2025, compared to $7,429 million for the 53-week fiscal year ended February 3, 2024. ***The 53rd week in fiscal 2023 represents a headwind of approximately 100 basis points to the net sales change in fiscal 2024.***

The company reported earnings per diluted share of $3. 61 for the year, compared to $3.84 in 2023. Full-year operating income was $1,266 million compared to $1, 285 million last year, and net income was $798 million compared to $878 million last year.

* * *

2025 Guidance

***For fiscal 2025, the company is forecasting net sales to grow between 1% to 3%*** compared to $7,307 million in fiscal 2024. ***Full-year 2025 earnings per diluted***

*share is expected to be between $3.25 and $3.60*, compared to $3.61 and adjusted earnings per diluted share of $3.29 in fiscal 2024. The company's full-year outlook includes the anticipated impact of approximately $300 million of cash deployed towards share repurchases. In Fiscal 2025, we expect to generate free cash flow of $750 to $850 million.

\* \* \*

| | Fourth Quarter | | Full-Year | |
| | 2024 (13 weeks) | 2023 (14 weeks) | 2024 (52 weeks) | 2023 (53 weeks) |
|---|---|---|---|---|
| Net Sales | $ 2,788 | $ 2,912 | $ 7,307 | $ 7,429 |
| Costs of Goods Sold, Buying and Occupancy | (1,487) | (1,575) | (4,073) | (4,193) |
| Gross Profit | 1,301 | 1,337 | 3,234 | 3,236 |
| General, Administrative and Store Operating Expenses | (623) | (641) | (1,968) | (1,951) |
| Operating Income | 678 | 696 | 1,266 | 1,285 |
| Interest Expense | (76) | (86) | (312) | (345) |
| Other Income | 10 | 12 | 74 | 81 |
| Income Before Income Taxes | 612 | 622 | 1,028 | 1,021 |
| Provision for Income Taxes | 159 | 43 | 230 | 143 |
| Net Income | $ 453 | $ 579 | $ 798 | $ 878 |
| Net Income Per Diluted Share | $ 2.09 | $ 2.55 | $ 3.61 | $ 3.84 |
| Weighted Average Diluted Shares Outstanding | 217 | 227 | 221 | 229 |

106. The same day, the Company published an investor presentation further discussing its financial results for the 2024 Fiscal Year (the "FY 2024 Investor Presentation").

107. The FY 2024 Investor Presentation attributed Bath & Body Works' financial results to "growing adjacencies" such as "expanded customer reach by growing adjacencies such as Men's, Hair, Lips and Laundry." Specifically, the FY 2024 Investor Presentation stated, in relevant part:



\* \* \*



***March 14, 2025 Form 10-K***

108.    On March 14, 2025, the Company filed its annual report on Form 10-K with the

SEC for its 2024 Fiscal Year (the "2024 Form 10-K"), which was signed by Defendant Boswell,

Boratto, Nash, Bogliolo, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil. The 2024

Form 10-K contained SOX certifications signed by Defendants Boswell and Boratto attesting to

the accuracy of the 2024 Form 10-K and that the 2024 Form 10-K "does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

109.    The 2024 Form 10-K continued to attribute the Company's decline in net sales to "customers continuing to select our [buy online pick up in store] option" and a "decline in wholesale shipments to our franchise partners affected by the war in the Middle East."

110.    The 2024 Form 10-K stated, in relevant part:

Our Competitive Strengths

We believe the following competitive strengths contribute to our leading market position, differentiate us from our competitors and will drive future long-term sustainable growth:

* * *

We are continuously offering innovation and newness to customers through compelling product introductions paired with exciting marketing activities. During 2024, we rolled out Everyday Luxuries, our prestige-inspired line of fine fragrance mists, and we view it as a platform to drive long-term growth and expect to expand the collection in 2025. *We also believe that adjacencies are an opportunity to expand our product portfolio, applying our fragrance expertise and leadership to large addressable markets. Another key element across our core business is collaborations, which allow us to deliver highly differentiated storytelling that generates top-of-mind brand awareness with existing and new customers, drive traffic and enhance our cultural relevancy*. In 2024, we launched collaborations with leading brands in pop culture through partnerships and plan to continue to build upon this strategy in 2025.

* * *

*Net Sales*

The following table provides Net Sales for 2024 in comparison to 2023:

|  | 2024 | 2023 | % Change |
|---|---|---|---|
|  | (in millions) | | |
| Stores - U.S. and Canada (a) | $ 5,534 | $ 5,507 | 0.5 % |
| Direct - U.S. and Canada | 1,474 | 1,582 | (6.8 %) |
| International (b) | 299 | 340 | (11.8 %) |
| **Total Net Sales** | $ 7,307 | $ 7,429 | (1.6 %) |

———————

(a)     Results include fulfilled BOPIS orders.

(b)     Results include royalties associated with franchised stores and wholesale sales.

For 2024, total Net Sales decreased $122 million to $7. 307 billion, and was negatively impacted by approximately 100 basis points due to the 53rd week in fiscal 2023.

Direct Net Sales decreased $ 108 million, or 6.8%, *due to a decline in orders, which was primarily due to our customers continuing to select our BOPIS option* (which is recognized as store Net Sales) and the 53rd week in 2023, partially offset by an increased average order size. International Net Sales decreased $41 million, or 11. 8%, primarily *driven by a decline in wholesale shipments to our franchise partners affected by the war in the Middle East*. Stores Net Sales increased $27 million, which was effectively flat, primarily due to new store growth and the increase in BOPIS fulfilled orders offset by a decline in average dollar sales and the 53rd week in 2023.

\* \* \*

Fiscal 2025 Outlook

We believe our strategy and actions position the Company to achieve sustainable, profitable growth and to drive long-term shareholder value. *We believe our continued innovation across our core categories supported by compelling marketing and enhanced technology, building on innovation platforms we launched in 2024 and extending our reach through adjacencies and international expansion, will accelerate Net Sales growth*. We anticipate continuing macroeconomic pressures and do not anticipate improvement in consumer sentiment with the continued challenging backdrop of economic uncertainty in 2025.

***April 25, 2025 Proxy Statement***

111.     On April 25, 2025, the Company filed its annual proxy statement on Schedule 14A with the SEC (the "2025 Proxy Statement"). Defendants Nash, Bogliolo, Boswell, Brady, Hondal,

44

Lee, Rajlin, Steinour, Symancyk, and Voskuil solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

112. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil the Board; (2) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting from for the 2025 Fiscal Year; and (3) provide a non-binding advisory vote on the compensation for the Company's named executive officers for the 2024 Fiscal Year.

113. Regarding "Board Role in Risk Oversight," the 2025 Proxy Statement stated:

The Board as a whole has responsibility for risk oversight, with a focus on the most significant risks facing the Company, including strategic, competitive, economic, operational, legal, regulatory, sustainability and compliance risks. In addition, certain committees of the Board have been assigned oversight of risk areas that are particularly relevant to their respective areas of responsibility and oversight. For example, the Audit Committee oversees our enterprise risk management program and reviews policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures. The Audit Committee also reviews policies and practices with respect to cybersecurity risk and the Company's data security policies. The HCC Committee considers the risks to our business associated with our compensation policies and practices from the perspective of enterprise risk. The HCC Committee is also responsible for overseeing any allegation of any claim of discrimination, harassment or retaliation that presents a material risk to the Company. The Nominating & Governance Committee reviews the Company's corporate governance structure, director succession matters and sustainability matters. All committees report to the full Board on risk matters as appropriate. The nature and effect of the risks faced by our Company vary in many ways. The potential impact of some risks may be minor, and accordingly, as a matter of business judgment, allocating significant resources to avoid or mitigate a minor potential adverse impact may not be prudent. In some cases, a higher degree of risk may be acceptable. As such, the amount of oversight of the Board for different types of risk depends on the nature of the risk.

The risk oversight responsibility of the Board and its committees is supported by our management reporting processes, which are designed to provide visibility to the Board to those Company personnel responsible for risk assessment, including

our Chief Legal Officer, who also serves as our Chief Compliance Officer and reports to the Chief Executive Officer, and to provide information about management's identification, assessment and mitigation strategies for critical risks. Our management team is responsible for day-to-day risk management. This includes identifying, evaluating and addressing potential risks that may exist at the enterprise, strategic, reputational, financial, operational, legal, compliance and reporting levels. The Board maintains an open dialogue with, has regular access to, and receives ongoing updates from, management and, when appropriate, outside advisors and experts, with respect to any potential risks identified by management. The Board believes that this division of responsibilities among the Board, its committees and management allow us to appropriately monitor risks over the short, intermediate and long-term.

114. Regarding "Code of Conduct, Insider Trading, Governance Documents and Related Person Transactions," the 2025 Proxy Statement stated, in relevant part:

The Company has a code of conduct that is applicable to all of our associates, officers and directors. Any amendments to the code or any waivers from any provisions of the code granted to executive officers or directors will be promptly disclosed to shareholders through posting on the Company's website at www.bbwinc.com.

115. Regarding the "Audit Committee," the 2025 Proxy Statement defined the responsibilities of the Audit Committee as:

• Oversees the integrity of the Company's financial statements and internal controls

• Reviews significant legal and regulatory matters affecting the Company as well as significant matters arising under the Company's code of conduct

• Oversees the Company's ethics and compliance function, including at least quarterly reports to the committee

• Oversees the qualifications, independence and performance of the Company's independent auditors

• Oversees the performance of the Company's internal audit function

• Oversees the Company's enterprise risk management program and has primary responsibility for oversight of the Company's policies and practices with respect to risk assessment and risk management, including the Company's policies and practices with respect to cybersecurity risk and the Company's data security policies

46

116.     Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company overstated the success of its growth strategy focusing on pursuing adjacencies, collaborations, and promotions; (2) as the Company's growth strategy was showing signs of weakness, the Company relied on brand collaborations to obfuscate weak financial results; and (3) as a result, it was unlikely that the Company was going to meet its financial guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

117.     The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

118.     As a result of Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting from for the 2025 Fiscal Year; and (3) approve on an a non-binding advisory basis, the compensation for the Company's named executive officers for the 2024 Fiscal Year.

***May 19, 2025 Press Release***

119.     On May 19, 2025, the Company issued a press release reporting its preliminary financial results for the first quarter of its 2025 Fiscal Year, and reaffirming the Company's 2025 full year guidance:

Company Pre-Announces First Quarter 2025 Net Sales and Earnings Per Diluted Share Results

In connection with today's announcement, the Company is pre-announcing its preliminary first quarter net sales and earnings per diluted share results. For the first quarter ended May 3, 2025, net sales were $1, 424 million, an increase of 3% compared to the prior year period. Earnings per diluted share were $0.49 for the first quarter of 2025, compared to $0.38 last year. First quarter 2025 sales were at the high end of the guidance range, and earnings per share exceeded the high end of the guidance range. ***The Company maintains its initial full-year 2025 net sales guidance of 1% to 3% growth and $3. 25 to $3. 60 earnings per diluted share***.

***May 29, 2025 Financial Reports***

120.     On May 29, 2025, the Company issued another press release reporting its financial results for its first quarter of the 2025 Fiscal Year (the "1Q 2025 Earnings Press Release"). The 1Q 2025 Earnings Press Release stated, in relevant part:

Bath & Body Works Reports 2025 First Quarter Results and Maintains Fiscal Year 2025 Guidance

● First quarter net sales up 3% to $1. 4 billion, at the high end of the guidance range, and earnings per diluted share up 29% to $0.49, exceeding the high end of the guidance range

● ***Net sales performance driven by compelling innovation***

● Company maintains 2025 net sales guidance of 1% to 3% growth and earnings per diluted share guidance of $3.25 to $3.60, inclusive of current tariff rates

* * *

First Quarter 2025 Results

The company reported net sales of $1,424 million for the quarter ended May 3, 2025, an increase of 2. 9% compared to net sales of $1,384 million for the quarter ended May 4, 2024.

48

The company reported earnings per diluted share of $0.49 for the first quarter of 2025, compared to $0.38 last year.

First quarter operating income was $209 million compared to $187 million last year, and net income was $105 million compared to $87 million last year.

\* \* \*

2025 Guidance

The company is maintaining its full-year 2025 **net sales guidance of 1% to 3% growth**, compared to $7,307 million in fiscal 2024, **and 2025 full-year earnings per diluted share guidance of $3. 25 to $3.60**, compared to earnings per diluted share of $3.61 and adjusted earnings per diluted share of $3. 29 in fiscal 2024. The company's full-year outlook includes the anticipated impact of all tariff rates currently in effect and levied by the U. S. government and other countries. Our outlook also includes the anticipated impact of approximately $300 million of cash deployed towards share repurchases. In Fiscal 2025, we continue to expect to generate free cash flow of $750 million to $850 million.

**The company expects second quarter 2025 net sales to be flat to up 2% compared to $1,526 million in the second quarter of 2024. Second quarter 2025 earnings per diluted share is expected to be between $0.33 and $0.38, compared to earnings per diluted share of $0.68** and adjusted earnings per diluted share of $0.37 in the second quarter of 2024. Our second quarter 2025 outlook also includes the anticipated impact of all tariff rates as referenced above.

\* \* \*

|  | First Quarter | |
| --- | --- | --- |
|  | 2025 | 2024 |
| Net Sales | $ 1,424 | $ 1,384 |
| Costs of Goods Sold, Buying and Occupancy | (778) | (778) |
| Gross Profit | 646 | 606 |
| General, Administrative and Store Operating Expenses | (437) | (419) |
| Operating Income | 209 | 187 |
| Interest Expense | (71) | (82) |
| Other Income | 8 | 13 |
| Income Before Income Taxes | 146 | 118 |
| Provision for Income Taxes | (41) | (31) |
| Net Income | $ 105 | $ 87 |
| Net Income per Diluted Share | $ 0.49 | $ 0.38 |
| Weighted Average Diluted Shares Outstanding | 215 | 226 |

121.    The same day, the Company published an investor presentation further discussing its financial results for the first quarter of 2025 (the "1Q 2025 Investor Presentation"). The 1Q

2025 Investor Presentation attributed the Company's financial results were driven by, in part, "our adjacent categories of Men's, Lips, Hair and Laundry." The 1Q 2025 Investor Presentation further stated that the "Men's category remains a compelling avenue."

122.    Specifically, the 1Q 2025 Investor Presentation stated, in relevant part:



\* \* \*

## FY 2025 GUIDANCE

$ in millions, except earnings per share

| METRIC | GUIDANCE (May 29, 2025) | GUIDANCE (February 27, 2025) |
|---|---|---|
| Net Sales | up 1% – up 3% | up 1% – up 3% |
| Gross Profit Rate | ~44% | ~44% |
| SG&A Expense Rate | ~27.5% | ~27% |
| Net Non-Operating Expense | ~$255 | ~$255 |
| Tax Rate | ~26% | ~26% |
| Weighted Average Diluted Shares Outstanding | ~212 million | ~213 million |
| Earnings Per Diluted Share | $3.25 - $3.60 | $3.25 - $3.60 |
| Capital Expenditures | $250 - $270 | $250 - $270 |
| Free Cash Flow | $750 - $850 | $750 - $850 |

\* \* \*

50

## Q2 2025 GUIDANCE

$ in millions, except earnings per share

| METRIC | GUIDANCE (May 29, 2025) |
|---|---|
| Net Sales | Flat to up 2% |
| Gross Profit Rate | ~41% |
| SG&A Expense Rate | ~30% |
| Net Non-Operating Expense | ~$65 |
| Tax Rate | ~29% |
| Weighted Average Diluted Shares Outstanding | ~212 million |
| Earnings Per Diluted Share | $0.33 - $0.38 |

123.    Also on May 29, 2025, the Company filed its quarterly report on Form 10-Q with the SEC for the first quarter of the 2025 Fiscal Year (the "1Q 2025 Form 10-Q"), which was signed by Defendant Boratto. The 1Q 2025 Form 10-Q contained SOX certifications signed by Defendants Heaf and Boratto attesting to the accuracy of the 1Q 2025 Form 10-Q and that the 1Q 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

124.    The 1Q 2025 Form 10-Q continued to attributed a decline in Bath & Body Work's certain net sales to "customers continuing to select our [buy online pick up in store] option" and to an increase of "timing of product shipments to our partners." The 1Q 2025 Form 10-Q continued to highlight the Company's growth strategy through adjacencies, stating that the Company was "extending our reach through adjacencies" "will continue to accelerate Net Sales growth over the long term."

125.    Specifically, the 1Q 2025 Form 10-Q stated, in relevant part:

51

Outlook

We believe our strategy and actions position the Company to achieve sustainable, profitable growth and to drive long-term shareholder value. We believe our continued innovation across our core categories supported by compelling marketing and enhanced technology, building on innovation platforms we launched in 2024 and ***extending our reach through adjacencies and international expansion, will continue to accelerate Net Sales growth over the long term***. Amid a challenging macroeconomic backdrop, we have remained disciplined and decisive in our actions which is evidenced in our current performance.

\* \* \*

The following table provides Net Sales for the first quarter of 2025 in comparison to the first quarter of 2024:

| | 2025 | 2024 | % Change |
|---|---|---|---|
| | (in millions) | | |
| Stores - U.S. and Canada (a) | $ 1,110 | $ 1,065 | 4.3 % |
| Direct - U.S. and Canada | 250 | 261 | (4.3 %) |
| International (b) | 64 | 58 | 10.1 % |
| **Total Net Sales** | $ 1,424 | $ 1,384 | 2.9 % |

(a)Results include fulfilled buy online pick up in store ("BOPIS") orders.
(b)Results include royalties associated with franchised stores and wholesale sales.

For the first quarter of 2025, total Net Sales were $1,424 million and increased $40 million, or 2.9%, compared to the first quarter of 2024. Stores Net Sales increased $45 million, or 4.3%, primarily driven by an increase in transactions due to an increase in BOPIS fulfilled orders (which are recognized as store Net Sales) and new store growth, and an increase in average dollar sales. Direct Net Sales decreased $11 million, or 4.3%, driven ***by a decline in fulfilled orders, which was primarily due to our customers continuing to select our BOPIS option***, partially offset by an increase in average order size. International Net Sales increased $6 million, or 10.1%, ***driven by timing of product shipments to our partners***.

126.    The above statements in ¶¶ 83-110, 119-125  were materially false and misleading and failed to disclose, inter alia, that: (1) the Company overstated the success of its growth strategy focusing on pursuing adjacencies, collaborations, and promotions; (2) as the Company's growth strategy was showing signs of weakness, the Company relied on brand collaborations to obfuscate

52

weak financial results; and (3) as a result, it was unlikely that the Company was going to meet its financial guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

***August 28, 2025 Earnings Press Release***

127.    The truth began to emerge on August 28, 2025, when the Company issued the 2Q 2025 Earnings Press Release. The 2Q 2025 Earnings Press Release revealed earnings per diluted share of $0.30, representing a 55.8% decline, and missing the Company's guidance on the low end by $0.03. The 2Q 2025 Earnings Press Release also revealed net income of $64 million, representing a 57.9% decline year-over-year. As a result, Bath & Body Works announced it was cutting its full year guidance to $3.28 to $3.53.

128.    Specifically, the 2Q 2025 Earnings Press Release stated, in relevant part:

Bath & Body Works Reports 2025 Second Quarter Results and Updates Fiscal Year 2025 Guidance

● Second quarter net sales up 1. 5% to $1. 5 billion, at the high end of the guidance range

● Earnings per diluted share of $0. 30; adjusted earnings per diluted share of $0. 37, at the high end of the guidance range

● Full-year 2025 earnings per diluted share guidance of $3. 28 to $3. 53

* * *

Second Quarter 2025 Results

The company reported net sales of $1,549 million for the quarter ended August 2, 2025, an increase of 1.5% compared to net sales of $1, 526 million for the quarter ended August 3, 2024.

***The company reported earnings per diluted share of $0.30 for the second quarter of 2025***, compared to $0.68 last year. Second quarter operating income was $157 million compared to $183 million last year, and ***net income was $64 million compared to $152 million last year.***

53

\* \* \*

2025 Guidance

The company is narrowing its full-year 2025 net sales guidance from 1% to 3% growth to 1. 5% to 2.7% growth, compared to $7,307 million in fiscal 2024. ***Full year 2025 earnings per diluted share is now expected to be between $3.28 to $3.53,*** compared to earnings per diluted share of $3. 61 in fiscal 2024.

\* \* \*

The company expects third quarter 2025 net sales to be up 1% to 3%, compared to $1,610 million in the third quarter of 2024. ***Third quarter 2025 earnings per diluted share is expected to be between $0.37 and $0.45***, compared to $0.49 in the third quarter of 2024. Our third quarter 2025 outlook also includes the anticipated impact of all tariff rates as referenced above.

129. On this news, the Company's stock price fell $2.18, or 6.9%, from a close at $31.54 on August 27, 2025 to close at $29.36 per share on August 28, 2025, on heavy trading volume.

***November 20, 2025 Financial Reports***

130. The truth fully emerged on November 20, 2025, when the Company issued a press release reporting disappointing financial results for the third quarter of its 2025 Fiscal Year (the "3Q 2025 Earnings Press Release"). The 3Q 2025 Earnings Press Release revealed that the Company's revenue declined 1% year-over-year, missing guidance of 1-3% growth for the third quarter. Additionally, the 3Q 2025 Earnings Press Release revealed that net income declined 26% to $77 million. Further, the 3Q 2025 Earnings Press Release stated that the Company was cutting full year guidance for net sales from positive 1.5%-2.7% to negative "high single digits, and earnings per diluted share from a range of $3.28 to $3.53 to "at least $2.83."

131. Specifically, the 3Q 2025 Earnings Press Release stated, in relevant part:

Bath & Body Works Outlines Strategic Transformation for Sustainable Growth and Reports 2025 Third Quarter Results

● Launches the Consumer First Formula with four strategic priorities to drive

54

sustainable long-term growth

● Third-quarter net sales of $1. 6 billion, down 1%. Earnings per diluted share of $0. 3 7; Adjusted earnings per diluted share of $0. 35

● Q4 and full-year 2025 guidance lowered reflecting current business trends and continuation of recent macro consumer pressures

\* \* \*

Third Quarter 2025 Results

The company reported net sales of $1,594 million for the quarter ended November 1, 2025, a decrease of 1% compared to net sales of $1,610 million for the quarter ended November 2, 2024.

Earnings per diluted share were $0.37 for the third quarter of 2025, compared to $0.49 last year. Third quarter operating income was $161 million compared to $218 million last year, and net income was $77 million compared to $106 million last year

\* \* \*

2025 Guidance

The company is revising its full-year 2025 net sales guidance from 1.5% to 2.7% growth to a decline of low single digits, compared to $7,307 million in fiscal 2024. Full-year 2025 earnings per diluted share is now expected to be at least $2.83, compared to earnings per diluted share of $3.61 in fiscal 2024. Full-year 2025 adjusted earnings per diluted share is now expected to be at least $2.87, compared to adjusted earnings per diluted share of $3.29 in fiscal 2024.

132. The same day, the Company published an investor presentation further discussing its financial results for the third quarter of the 2025 Fiscal Year (the "3Q 2025 Investor Presentation"). The 3Q 2025 Investor Presentation revealed that the Company's strategy of adjacencies, collaborations and promotions" had "not grown our total customer base." The 3Q 2025 Investor Presentation also stated that the Company's focus on adjacencies had "reduced focus on investing in our core categories;" that collaborations "have been used to cany quarters;" and that the Company had become "overly reliant on deeper and more frequent promotions to drive

55

growth." As a result, the Company announced it would exit certain adjacencies to focus on core categories.

133. Specifically, the 3Q 2025 Investor Presentation stated, in relevant part:



\* \* \*



134. Also on November 20, 2025, the Company held an earnings call to discuss its financial results for the third quarter of 2025 (the "3Q 2025 Earnings Call").

56

135.    During the 3Q 2025 Earnings Call, Defendant Heaf stated that Bath & Body Works would make "selective category exits such as hair and men 's grooming as we refocus on the core" starting in the first half of the 2026 Fiscal Year. Defendant Heaf further stated that [t]he problem is those adjacencies haven't grown in the way that we had expected, and they are not significant the ones that we are starting to take out[,]" and "We are no longer going to invest in adjacencies."

136.    Specifically, Defendant Heaf stated, in relevant part:

Let me first give you the diagnosis in 4 clear points. *Firstly, we pursued adjacencies to attract new consumers, but that strategy has not delivered the growth we expected and it reduced focus in investing in our core categories. Secondly, collaborations that should have been used to drive excitement, energy and equity into our brand have been used to carry quarters.*

*Thirdly, as these strategies and other tactics have not delivered growth, we have relied on deeper and more frequent promotions.* Great value and exciting deals have been part of our brand, and that will not change. However, over reliance on promotion delivers diminishing returns and erodes brand equity, and that is what has happened here. *While all these efforts appeal to our existing consumers, they did not grow our customer base, and we have not attracted a younger consumer.*

\* \* \*

Starting in the first half of next year, you will see thoughtful edits to our assortment and *selective category exits such as hair and men's grooming as we refocus on the core.*

\* \* \*

*The problem is those adjacencies haven 't grown in the way that we had expected*, and they are not significant the ones that we are starting to take out. So we're looking at every merchant does SKUs that are not contributing that much and SKUs that are not productive, and that's where we're starting in that long tail.

\* \* \*

And then when it comes to adjacencies, I want to just clarify what I've said. *We are no longer going to invest in adjacencies.* We are going to invest in our core. We have told you of 2 categories that we plan to exit in hair and men's grooming.

137.    On this news, the Company's stock price fell $5.22, or 24.8%, from a close at

57

$21.04 on November 19, 2025 to close at $15.82 per share on November 20 2025, on heavy trading volume.

## REPURCHASES DURING THE RELEVANT PERIOD

138.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $629.7 million to repurchase approximately 19,511,000 shares of its own common stock at artificially inflated prices between June 2024 and October 2025.

139.    According to the 2Q 2024 Form 10-Q, between June 1, 2024 and June 30, 2024, the Company repurchased 1,939,000 shares of its own common stock at an average price per share of approximately $43.23, for a total cost to the Company of $83,822,970.[4]

140.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $53,147,990 for repurchases of its own stock between June 1, 2024 and June 30, 2024.

141.    According to the 2Q 2024 Form 10-Q, between July 1, 2024 and July 31, 2024, the Company repurchased 1,192,000 shares of its own common stock at an average price per share of approximately $36.46, for a total cost to the Company of $43,460,320.

142.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $24,602,880 for repurchases of its own stock between July 1, 2024 and July 31, 2024.

143.    According to the 3Q 2024 Form 10-Q, between August 1, 2024 and August 31, 2024, the Company repurchased 1,417,000 shares of its own common stock at an average price

---

[4] Upon information and belief these repurchases were made during the Relevant Period.

per share of approximately $32.60, for a total cost to the Company of $46,194,200.

144. As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $23,777,260 for repurchases of its own stock between August 1, 2024 and August 31, 2024.

145. According to the 3Q 2024 Form 10-Q, between September 1, 2024 and September 30, 2024, the Company repurchased 1,223,000 shares of its own common stock at an average price per share of approximately $29.14, for a total cost to the Company of $35,638,220.

146. As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $16,290,360 for repurchases of its own stock between September 1, 2024 and September 30, 2024.

147. According to the 3Q 2024 Form 10-Q, between October 1, 2024 and October 31, 2024, the Company repurchased 569,000 shares of its own common stock at an average price per share of approximately $30.32, for a total cost to the Company of $17,252,080.

148. As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $8,250,500 for repurchases of its own stock between October 1, 2024 and October 31, 2024.

149. According to the 2024 Form 10-K, between November 1, 2024 and November 30, 2024, the Company repurchased 516,000 shares of its own common stock at an average price per share of approximately $32.02, for a total cost to the Company of $16,522,320.

150. As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $8,359,200 for repurchases of its own stock between November 1, 2024 and November 30, 2024.

151. According to the 2024 Form 10-K, between December 1, 2024 and December 31,

2024, the Company repurchased 552,000 shares of its own common stock at an average price per share of approximately $38.26, for a total cost to the Company of $21,119,520.

152.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $12,386,880 for repurchases of its own stock between December 1, 2024 and December 31, 2024.

153.    According to the 2024 Form 10-K, between January 1, 2025 and January 31, 2025, the Company repurchased 412,000 shares of its own common stock at an average price per share of approximately $37.12, for a total cost to the Company of $15,293,440.

154.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $8,775,600 for repurchases of its own stock between January 1, 2025 and January 31, 2025.

155.    According to the 1Q 2025 Form 10-Q, between February 1, 2025 and February 28, 2025, the Company repurchased 776,000 shares of its own common stock at an average price per share of approximately $37.19, for a total cost to the Company of $28,859,440.

156.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $16,583,120 for repurchases of its own stock between February 1, 2025 and February 28, 2025.

157.    According to the 1Q 2025 Form 10-Q, between March 1, 2025 and March 31, 2025, the Company repurchased 2,157,000 shares of its own common stock at an average price per share of approximately $31.40, for a total cost to the Company of $67,729,800.

158.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $33,606,060 for repurchases of its own stock between March 1, 2025 and March 31, 2025.

159.    According to the 1Q 2025 Form 10-Q, between April 1, 2025 and April 30, 2025, the Company repurchased 1,525,000 shares of its own common stock at an average price per share of approximately $27.89, for a total cost to the Company of $42,532,250.

160.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $18,406,750 for repurchases of its own stock between April 1, 2025 and April 30, 2025.

161.    According to the 2Q 2025 Form 10-Q, between May 1, 2025 and May 31, 2025, the Company repurchased 608,000 shares of its own common stock at an average price per share of approximately $29.32, for a total cost to the Company of $17,826,560.

162.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $8,208,000 for repurchases of its own stock between May 1, 2025 and May 31, 2025.

163.    According to the 2Q 2025 Form 10-Q, between June 1, 2025 and June 30, 2025, the Company repurchased 2,258,000 shares of its own common stock at an average price per share of approximately $27.76, for a total cost to the Company of $62,682,080.

164.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $26,960,520 for repurchases of its own stock between June 1, 2025 and June 30, 2025.

165.    According to the 2Q 2025 Form 10-Q, between July 1, 2025 and July 31, 2025, the Company repurchased 1,382,000 shares of its own common stock at an average price per share of approximately $31.50, for a total cost to the Company of $43,533,000.

166.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $21,669,760 for

repurchases of its own stock between July 1, 2025 and July 31, 2025.

167.    According to the 3Q 2025 Form 10-Q, between August 1, 2025 and August 31, 2025, the Company repurchased 1,987,000 shares of its own common stock at an average price per share of approximately $29.39, for a total cost to the Company of $58,397,930.

168.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $26,963,590 for repurchases of its own stock between August 1, 2025 and August 31, 2025.

169.    According to the 3Q 2025 Form 10-Q, between September 1, 2025 and September 30, 2025, the Company repurchased 996,000 shares of its own common stock at an average price per share of approximately $28.95, for a total cost to the Company of $28,834,200.

170.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $13,077,480 for repurchases of its own stock between September 1, 2025 and September 30, 2025.

171.    According to the 3Q 2025 Form 10-Q, between October 1, 2025 and October 31, 2025, the Company repurchased 2,000 shares of its own common stock at an average price per share of approximately $25.16, for a total cost to the Company of $50,320.

172.    As the Company's stock was actually worth only $15.82 per share, the price at closing on November 20, 2025, the Company overpaid by approximately $18,680 for repurchases of its own stock between October 1, 2025 and October 31, 2025.

173.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of 19,511,000 shares of its own common stock by approximately $321.1 million between June 2024 and October 2025.

## DAMAGES TO BATH & BODY WORKS

174. As a direct and proximate result of the Individual Defendants' conduct, Bath & Body Works has lost and expended, and will continue to lose and expend, many millions of dollars.

175. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

176. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

177. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law and payments of any fines or settlement amounts associated with the Company's violations.

178. Such losses include the Company's overpayment of approximately $321.1 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

179. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

180. As a direct and proximate result of the Individual Defendants' conduct, Bath & Body Works has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment,

abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

181.    Plaintiff brings this action derivatively and for the benefit of Bath & Body Works to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Bath & Body Works,  unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

182.    Bath & Body Works is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

183.    Plaintiff is, and has been at all relevant times, a shareholder of Bath & Body Works.

184.    Plaintiff will adequately and fairly represent the interests of Bath & Body Works in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

185.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Bath & Body Works's Board consisted of ten directors, Defendants Heaf, Bogliolo, Brady, Hondal, Lee, Rajlin, Nash, Steinour, Symancyk, and Voskuil (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Director-Defendants that were on the Board at the time this action was filed.

187.    Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

188. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Bath & Body Works to issue materially false and misleading statements. Specifically, the Director-Defendants caused Bath & Body Works to issue false and misleading statements which were intended to make Bath & Body Works appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

189. Additional reasons that demand on Defendant Heaf is futile follow. Defendant Heaf has served as the Company's CEO since May 2025 and as a Company director since June 2025. The Company provides Defendant Heaf with his primary occupation, for which he receives handsome compensation. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Heaf is a defendant in the Securities Class Action. For these reasons, too, Defendant Heaf breached his fiduciary duties, faces a substantial likelihood

65

of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190. Additional reasons that demand on Defendant Bogliolo is futile follow. Defendant Bogliolo has served as a Company director since 2022. He also serves the Chair of the Nominating and Governance Committee and as a member of the Human Capital and Compensation Committee. Defendant Bogliolo receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Bogliolo personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Bogliolo solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Bogliolo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191. Additional reasons that demand on Defendant Brady is futile follow. Defendant Brady has served as a Company director since 2023. She also serves as a member of the Human Capital and Compensation Committee and the Nominating and Governance Committee. Defendant Brady receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties

66

to protect corporate assets. Additionally, Defendant Brady personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Brady solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Brady breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

192.    Additional reasons that demand on Defendant Hondal is futile follow. Defendant Hondal has served as a Company director since 2021. She also serves as the Chair of the Human Capital and Compensation Committee and as a member of the Audit Committee. Defendant Hondal receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Hondal personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Hondal solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Hondal breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile.

193.    Additional reasons that demand on Defendant Lee is futile follow. Defendant Lee has served as a Company director since 2021. She also serves as a member of the Human Capital

67

and Compensation Committee and the Nominating and Governance Committee. Defendant Lee receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Lee personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Lee solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Lee breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

194. Additional reasons that demand on Defendant Nash is futile follow. Defendant Nash has served as a Company director and as the Chair of the Board since 2019. Defendant Nash receives handsome compensation for her role as director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant Nash personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Nash solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. Further, Defendant Nash's insider sales while the Company's stock price was

68

artificially inflated as a result of the false and misleading statements herein, further demonstrate her motive in facilitating and participating in the scheme. For these reasons, too, Defendant Nash breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

195. Additional reasons that demand on Defendant Rajlin is futile follow. Defendant Rajlin has served as a Company director since 2022. He also serves a member of the Audit Committee and the Nominating and Governance Committee. Defendant Rajlin receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Rajlin personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Rajlin solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Rajlin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196. Additional reasons that demand on Defendant Steinour is futile follow. Defendant Steinour has served as a Company director since 2014. He also serves a member of the Audit Committee and the Human Capital and Compensation Committee. Defendant Steinour receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Steinour personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Steinour solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Steinour breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197. Additional reasons that demand on Defendant Symancyk is futile follow. Defendant Symancyk has served as a Company director since 2021. He also serves a member of the Audit Committee and the Nominating and Governance Committee. Defendant Symancyk receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Symancyk personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Symancyk solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Symancyk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

70

198. Additional reasons that demand on Defendant Voskuil is futile follow. Defendant Voskuil has served as a Company director since 2023. He also serves the Chair of the Audit Committee and as a member of the Human Capital and Compensation Committee. Defendant Voskuil receives handsome compensation for his role as director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Voskuil personally signed the false and misleading 2024 Form 10-K. Moreover, Defendant Voskuil solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and led to the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company. For these reasons, too, Defendant Voskuil breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199. Additional reasons that demand on the Board is futile follow.

200. Defendants Voskuil (as Chair), Hondal, Rajlin, Steinour, and Symancyk (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to

71

adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

201.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

202.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

203.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

72

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

204.	The acts complained of herein constitute violations of fiduciary duties owed by Bath & Body Works' officers and directors, and these acts are incapable of ratification.

205.	The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Bath & Body Works. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Bath & Body Works, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

206.	If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Bath & Body Works to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is

futile in that event, as well.

207.     Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil for Violations of Section 20(a) of the Securities Exchange Act of 1934**

208.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

210.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

211.     Under the direction and watch of Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to

74

the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

212.    The 2025 Proxy Statement also failed to disclose that: (1) the Company overstated the success  of its growth strategy focusing on pursuing adjacencies, collaborations, and promotions; (2) as the Company's growth strategy was showing signs of weakness, the Company relied on brand collaborations to obfuscate weak financial results; and (3) as a result, it was unlikely that the Company was going to meet its financial guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

213.    In the exercise of reasonable care, Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement including, but not limited to, the re-election of directors.

214.    As a result of Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Nash, Bogliolo, Boswell, Brady, Hondal, Lee, Rajlin, Steinour, Symancyk, and Voskuil the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting from for the 2025 Fiscal

Year; and (3) approve on an a non-binding advisory basis, the compensation for the Company's named executive officers for the 2024 Fiscal Year.

215.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2025 Proxy Statement.

216.    Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

217.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.    The Individual Defendants, by virtue of their positions with Bath & Body Works and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Bath & Body Works and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Bath & Body Works to engage in the illegal conduct and practices complained herein.

219.    Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Bath & Body Works. Not only is Bath & Body Works now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon

Bath & Body Works by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over 19.5 million shares of its own shares at artificially inflated prices, damaging Bath & Body Works.

222.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

223.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bath & Body Works not misleading.

224.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

225.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the

77

Exchange Act, and Rule 10b-5 promulgated thereunder.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

226. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

227. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Bath & Body Works' business and affairs.

228. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

229. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Bath & Body Works.

230. In breach of their fiduciary duties owed to Bath & Body Works, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, inter alia, that: (1) the Company overstated the success of its growth strategy focusing on pursuing adjacencies, collaborations, and promotions; (2) as the Company's growth strategy was showing signs of weakness, the Company relied on brand collaborations to obfuscate weak financial results; and (3) as a result, it was unlikely that the Company was going to meet its financial guidance. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

231. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

232.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

233.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

234.    In yet further breach of their fiduciary duties, during the relevant period the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $3.7 million.

235.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bath & Body Works' securities.

236.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately

79

maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Bath & Body Works' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

237. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

238. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bath & Body Works has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

239. Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Unjust Enrichment**

240. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

241. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Bath & Body Works.

242. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Bath & Body Works that was tied to the performance or artificially inflated valuation of Bath & Body Works, or received compensation or other payments that were unjust in light of the Individual Defendants'

80

bad faith conduct.

243.    Plaintiff, as a shareholder and representative of Bath & Body Works, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

244.    Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

245.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

246.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bath & Body Works, for which they are legally responsible.

247.    As a direct and proximate result of the Individual Defendants' abuse of control, Bath & Body Works has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

248.    Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

249.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

250.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Bath & Body Works in a manner

consistent with the operations of a publicly held corporation.

251.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Bath & Body Works has sustained and will continue to sustain significant damages.

252.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

253.    Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

### EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

254.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

255.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

256.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

257.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

258.    Plaintiff, on behalf of Bath & Body Works, has no adequate remedy at law.

### NINTH CLAIM
### Against Defendants Boswell,  Heaf, and Boratto  for Contribution Under Sections 10(b) and 21D of the Exchange Act

259.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

82

260. Bath & Body Works and Defendants Boswell, Heaf, and Boratto are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Boswell's, Heaf's, and Boratto's willful and/or reckless violations of their obligations as officers and/or directors of Bath & Body Works.

261. Defendants Boswell, Heaf, and Boratto, because of their positions of control and authority as officers and/or directors of Bath & Body Works, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Bath & Body Works, including the wrongful acts complained of herein and in the Securities Class Action.

262. Accordingly, Defendants Boswell, Heaf, and Boratto are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

263. As such, Bath & Body Works is entitled to receive all appropriate contribution or indemnification from Defendants Boswell, Heaf, and Boratto.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Bath & Body Works, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and

abetted the breach of their fiduciary duties to Bath & Body Works;

(c)     Determining and awarding to Bath & Body Works the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Bath & Body Works and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bath & Body Works and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Bath & Body Works to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Bath & Body Works restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

84

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: February 27, 2026

                                        Respectfully submitted,

                                        **BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

                                        */s/ Michael J. Boyle, Jr.*
                                        Michael J. Boyle
                                        4200 Regent Street, Suite 200
                                        Columbus, OH 43219
                                        Tel: (212) 967-7296
                                        Email: mboyle@bgandg.com

                                        **THE BROWN LAW FIRM, P.C.**
                                        Timothy Brown
                                        767 Third Avenue, Suite 2501
                                        New York, NY 10017
                                        Tel: (516) 922-5427
                                        Fax: (516) 344-6204
                                        Email: tbrown@thebrownlawfirm.net

                                        *Counsel for Plaintiff*

Docusign Envelope ID: 87F855CD-F65A-467A-A5FC-648B496C32AD

## **VERIFICATION**

I, Jyothiswaroop Jayaprakash, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27__ day of February 2026.

Signed by:

*Jyothiswaroop Jayaprakash*

4072F8A30A8A414...

Jyothiswaroop Jayaprakash